## THE ELLEN LITTLE.

(District Court, D. Massachusetts. September 13, 1916.)

### No. 1443.

SEAMEN ⊙⟶21—WAGES—FORFEITURE FOR MISCONDUCT.

 Libelant, who was mate of an American schooner, on a return voyage from Brazil learned that there was a stowaway on board. He did not inform the master, and on arrival at a United States port the stowaway, who was an alien, was smuggled on shore by members of the crew at night, for which, on its discovery by the authorities, proceedings were taken against the vessel, causing delay and expense. Libelant was not a party to the landing, and did not know of it, but took no measures to prevent it. The master also suspected the presence of a stowaway, but asked no questions. Libelant was not discharged, nor charged in the log at the time with any offense, as required by Rev. St. § 4597 (Comp. St. 1916, § 8381). *Held*, that he was not chargeable with disobedience of orders, or any other offense under Rev. St. § 4596 (Comp. St. 1916, § 8380), which worked a forfeiture of his wages, but that he should be required to pay a part of the expenses caused the vessel.

In Admiralty. Suit by William W. Humphrey against the Schooner Ellen Little. Decree for libelant.

Berry & Buckman, of Boston, Mass., for libelant.

Blodgett, Jones, Burnham & Bingham, of Boston, Mass., for respondent.

MORTON, District Judge. This is a libel brought by the first mate of the respondent vessel to recover his wages. He shipped at Providence for voyage to Pernambuco, Brazil, and return, at $55 per month. The parties agree that the amount of the unpaid wages is as stated in the libel. The defense is that the libelant is not entitled to recover by reason of his own misconduct.

The vessel arrived safely at Pernambuco and discharged her cargo. From that point she was bound to Apalachicola, Fla. She left Pernambuco on or about September 28, 1915. Owing to conditions created by the European war, there were in Pernambuco many Germans who were desirous of getting to this country. The probability of stowaways was recognized by the master of the Ellen Little, and he directed the libelant to make a careful search of the vessel for them before sailing. The search was made by the libelant, and by the boatswain under his orders. Two of the Little's crew were Germans, and, unknown to the master or to the libelant, they managed to secrete one of their fellow countrymen on the vessel. The libelant had no knowledge of this until the schooner was several days at sea, when he discovered that there was a stowaway on board. He did not report the fact to the master. This failure constitutes the first of the alleged breaches of duty. There

is no evidence that the libelant received any money on account of the stowaway, or that there was anything corrupt in his action, which, I infer, was prompted chiefly by good nature.

The crew of the Little consisted of eight men and the master. It seems unlikely that in a voyage lasting two months the presence of the stowaway was not known to everybody on board; and there are some things in the testimony which suggest that the master himself, while he did not absolutely know that there was a stowaway, turned a shut eye towards facts strongly indicating it. He admits that he became suspicious; but he ordered no further search of the vessel.

When the Little arrived at Carabelle, Fla., the master went ashore, leaving the libelant in charge. He let the small boat lie in the water alongside that night, and it was used by the two Germans to land the stowaway. This action of the libelant is charged as assistance in landing the alien and as neglect of duty towards the vessel. Humphrey testifies that the boat was not left out for any such purpose, that the work of mooring the schooner was completed late, and, as the night was calm, he saw no necessity for taking the boat aboard. There is nothing in conflict with this explanation, except the admitted fact that the boat was usually not left in the water overnight, and certain alleged admissions by Humphrey, testified to by Capt. Holden and denied by Humphrey. A charge of active assistance in a crime ought not to be sustained on mere suspicion, nor without adequate proof. That the libelant did not intend to do anything to prevent the landing of the stowaway is clear, but it is not established that he intentionally assisted therein.

The fact that a man had been surreptitiously landed from the vessel was discovered by the federal officers at the port. Proceedings were instituted, which resulted in the arrest of two of the crew and in holding another as a witness. The schooner was delayed a few days, and was put to expense on account of the affair.

All facts in reference to this matter became known to the master at Apalachicola. He did not discharge or disrate the libelant, but allowed him to continue in service until the voyage was completed. No entry was made in the Little's log at the time of the occurrences, nor until she had cleared from Apalachicola and was on her way up the coast, when a statement was written in the log by the master, charging the libelant with "willful neglect of duty" in not reporting the stowaway, and with "assisting to land an alien in the United States." The entry was not made "on the day on which the offense was committed" (R. S. § 4597 [Comp. St. 1916, § 8381]), nor "as soon as possible after the occurrence to which it relates" (R. S. § 4291 [Comp. St. 1916, § 8037]). On the completion of the voyage, at Boston, the managing owner of the vessel charged the libelant with one-third of her loss, on account of the stowaway, except demurrage, on the theory that he and the two Germans caused it, and $124.16 was held back from his pay, about one-third of it for the voyage.

No misconduct by the libelant, of any kind defined in R. S. § 4596 (Comp. St. 1916, § 8380), was charged or is established. The facts do not show a "willful disobedience to any lawful command at sea." Section 4596, cl. 4. There is no evidence that the libelant was ordered

to report stowaways; and it is not shown that he intentionally disobeyed orders in respect to searching the vessel at Pernambuco. The libelant is not charged on the log with disobedience. No deduction from the wages can be claimed as a penalty under the section referred to.

The alleged deduction rests, therefore, upon a right asserted under the general maritime law to deduct from the wages of an officer damages caused to the vessel by his failure to serve faithfully. See Willard v. Dorr, Fed. Cas. No. 17,680; Scott v. Russell, Fed. Cas. No. 12,546; The T. F. Whiton, Fed. Cas. No. 13,849; The Marjory Brown (D. C.) 134 Fed. 999. Such claims to deductions are to be received with caution.

"The court expressly recognized the general principle that after service for the stipulated period, and more particularly in the case of service on board a coasting vessel, refusal to pay full wages because of alleged incompetence or negligence should be discouraged. I do not think the inconvenience and expense of supplying the libelant's place at Apalachicola, which is assigned as the reason for permitting the libelant to complete the voyage as he had begun it, are sufficient to take this case out of the general rule." Dodge, J., in The Sadie C. Sumner (D. C.) 142 Fed. 611, 613.

The real cause of the trouble to the vessel was not the presence of the stowaway on board, but the discovery by the United States officers that he had been surreptitiously landed. I doubt whether either Capt. Holden or Mr. Humphrey had in mind what a substantial offense that would be, nor how it might involve the vessel. Humphrey did not intend to participate in such landing, nor to assist in it; but he did not adequately realize the necessity of taking active steps to prevent it. For similar reasons, Capt. Holden did not follow up his suspicions about a stowaway and ascertain, as he easily could have done, that there was one on board. The mate's silence to the master was partly because he and Capt. Holden were not on speaking terms. This hostility led the master, when the affair had become serious, to throw as much of the blame as possible on the mate. Humphrey was undoubtedly negligent in failing to prevent the landing, but his fault was not sufficient to warrant charging him equally with the two active lawbreakers in the crew. He was but little more to blame than the master himself. At the same time, considering that, as he knew, a substantial crime involving his vessel was likely to be committed, and that he did nothing to prevent it, I do not think his neglect can be passed over.

It is further urged for the vessel that the libelant agreed to the reduction made by the managing owner, and that there was an accord and satisfaction at that time. The libelant's position in that interview evidently was that all hands were more or less to blame for helping the stowaway. He testifies that he said he would stand his share of the loss if the rest did, that he did not agree to stand one-third of it, aside from demurrage, nor agree to a final settlement on that basis. Upon all the evidence, I do not think that the accord and satisfaction is made out.

Of the loss which the vessel sustained, $50 may be charged against the libelant and deducted from his wages; and he may have a decree for the balance, with costs.